## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## MIDLAND DIVISION

JOHNSTON CLAIRE

v.

LINEQUEST, LLC

**Case No.:**  7:21-cv-00251

## COMPLAINT

### Summary

1.      LineQuest, LLC (LineQuest) does not pay its Line Locators overtime as required by the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201 *et seq.* (FLSA).

2.      Plaintiff Johnston Claire was employed by Linequest to perform Line Locator services for EnLink Midstream (EnLink).

3.      Although Plaintiff regularly worked more than 40 hours a week, he did not receive any overtime pay as required by the FLSA.

4.      Thus, this action seeks to recover the unpaid wages and other damages owed to Plaintiff.

### Jurisdiction & Venue

5.      This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 216(b).

6.      LineQuest is a privately held company with its headquarters in this District and Division.

7.      A substantial part of the acts relevant to the causes of action alleged herein occurred in this District and Division.

## Parties

8.      Johnston Claire was a Line Locator employed by LineQuest to provide Line Locator services to EnLink. LineQuest paid him according to its no overtime pay policy. Claire has previously filed a written consent to sue LineQuest in *Mondeck, et al. v. Linequest, L.L.C.*, Civ. Action No. 7:19-CV-00221-DC (W.D. Tex) (ECF 34).

9.      LineQuest paid Plaintiff a flat salary for each week worked with no overtime premium for hours worked in excess of 40 in a workweek.

10.      LineQuest is a privately held limited liability company that operates in this District and Division. It employed Plaintiffs. In each of the past three years, LineQuest's annual gross revenues exceeded $500,000.  LineQuest may be served through its registered agent, Shawn Hailey, 7607 W. Industrial Ave., Midland, TX 79706-2803.

## Facts

11.       LineQuest is a damage prevention company specializing in line locating, mapping, and hydro-excavation."[1]

12.      Over the past three years, LineQuest employed over 100 individuals – including Plaintiffs – as Line Locators in a variety of locations.

13.      Line Locators routinely handle goods or materials – such as tools, steel toe boots, machinery, automobiles, and cell phones - that have moved in, or were produced for, interstate commerce.

14.      LineQuest's payroll records show the salaries paid to Plaintiff and the other Line Locators and the deductions LineQuest made from those salaries.

15.      Although LineQuest was required to maintain records showing the hours worked by Plaintiff, LineQuest failed to do so.

---

[1] http://linequestllc.com/company/about/

16.     From its other records and/or directives, LineQuest knows full well that Plaintiff regularly work far in excess of 40 hours in a week.

17.     Plaintiff is a Line Locator.

18.     Plaintiff is a non-exempt employee.

19.     Plaintiff was not paid on a salary basis.

20.     The primary duty of Plaintiff did not include work directly related to the management or general business operations of the employer or the employer's customers.

21.     The primary duty of Plaintiff did not include the exercise of discretion and independent judgment with respect to matters of significance.

22.     Line Locators are the workers who are sent out to locate and mark utilities when someone plans to dig in a location with existing underground utilities.

23.     The primary duty of a Line Locator is to locate and mark buried utilities such as natural gas pipelines.

24.     In the West Texas and New Mexico oilfields, there are thousands of buried utilities.

25.     When a company needs to dig in an oilfield, they must be sure they do not inadvertently dig into existing utilities, such as pipelines.

26.     A company planning to dig in an oilfield must contact the "811" system to report where, and when, they plan to dig.

27.     The 811 system has records of all buried utilities in the oilfield.

28.     When someone tells the 811 system they plan to dig in a certain portion of the oilfield, the 811 system creates "tickets" for all companies who have buried utilities in that area.

29.     These tickets require the company with existing utilities to mark and flag their utilities so the digging company will know where the existing utilities are located. That way, they will know if they are digging near, or across, an existing utility.

30.     Line Locators are tasked with locating the existing utilities in response to a ticket.

31.     They perform this line locating work for the company for whom they are providing locating services.

32.     LineQuest provides locating services to the owners of utilities in the oilfield.

33.     LineQuest employs Line Locators to provide these locating services.

34.     Line Locators located and marked the relevant pipeline(s) in the area.

35.     In locating lines, Line Locators had to follow the federal regulations regarding "OQ's" and "H2S."

36.     OQ's are Operator Qualifications. These regulations contain the requirements for locating and marking lines.

37.     H2S are Hydrogen Sulfide awareness regulations.

38.     These regulations make sure all workers in the oilfields know about, and how to respond to, the risks associated with Hydrogen Sulfide in the oilfields.

39.     Once they finished locating the pipeline, Line Locators had to take pictures showing the pipeline had been located and marked.

40.     They were required to either upload the pictures directly to the ticket or email the pictures to LineQuest.

41.     Sometimes, a Line Locator would be told (later) that there was a "conflict" with respect to a pipeline they had located and marked.

42.     A "conflict" meant the digging was going to cross the path of a pipeline they had located and marked.

43.     When that happened, they would get a call from the digging contractor telling them that he needed to dig the line out.

44.     A time would then be established for the digging to take place.

45.     The Line Locator would be there for the excavation.

46.     If there were no "conflict" between the pipeline being dug and the pipeline located and marked, Line Locators had no further duties with respect to the pipeline they had located and marked.

47.     If there was a conflict, the Line Locator was there as part of making sure the proper safety standards and procedures—whether set by federal regulations, LineQuest, or their client—were followed.

48.     Line Locators had nothing to do with setting these standards, nor could they deviate in any way from these standards.

49.     Oil and gas pipeline right of ways are typically 10 to 30 feet wide.

50.     If a Line Locator had to be on the Right of Way because there was a conflict, his/her duties were limited to the period the excavating contractor was excavating across that 10 to 30 foot Right of Way.

51.     This typically took 5 to 12 hours.

52.     A Line Locator's role at the excavation was to observe and report.

53.     They compared the excavation process with the established safety standards and procedures.

54.     They filled out a short, form, factual report of what the observed that day.

55.     The primary standards and procedures were 1) the excavation "bucket" could not be allowed to be placed within 2 feet of the existing pipeline, 2) the excavation met or exceeded the required clearance, and 3) the excavation bucket did not have exposed teeth.

56.     A Line Locator's job in observing excavations was to observe and report.

57.     A Line Locator had no authority to require anyone to do anything.

58.     All they could do is say something to the person in charge of the excavation crew and put it in their report to LineQuest's client.

59.     A Line Locator does not perform construction oversight.

60.     For example, they do not perform any budgeting, cost forecasting, subcontractor coordination, inventory management, scheduling of work, etc.

61.     They did not make purchases for the digging project.

62.     They could not authorize any change to standards or procedures.

63.     Line Locators do not supervise the excavation crew.

64.     They cannot tell them what to do or change how they performed their jobs.

65.     The excavation crew had their own supervisor.

66.     Line Locators had no authority over any of the excavation crew or its supervisors.

67.     Line Locators never created or developed any of the safety standards and procedures applicable to the excavation.

68.     They never gave any input or participated in the creation of these standards and procedures.

69.     Line Locators are not qualified to create or develop such standards and specifications.

70.     Line Locators have no authority to interpret or alter the safety standards and procedures applicable to the excavation.

71.     Line Locators could not deviate from any rules and specifications.

72.     Line Locators did not negotiate any contracts.

73.     Line Locators never "advised" LineQuest or its clients at all.

74.     Line Locators never advised LineQuest or its clients on policy determinations, nor did they advise anyone on how their businesses should be run.

75.     In performing their observe and report duties in conflict excavations, Line Locators applied well established techniques or procedures described in manuals or other sources within closely prescribed limits to determine the correct response to an inquiry or set of circumstances.

76.     These well-established techniques and procedures govern these excavations.

77.     Line Locators cannot deviate from them.

78.     Line Locators are not permitted to use "discretion."

79.     If, for example, an excavation bucket is being used within 2 feet of the existing pipeline, Line Locators are required to act even if the Line Locator thought there was no danger presented.

80.     If they spoke to excavators or contractors, Line Locators could only report the procedures and/or policies established by someone else.

81.     Again, they could not deviate from those procedures or policies.

82.     For example, when they checked the coating, all they did was check whether the pipe had been scratched.

83.     They compared the condition of the pipeline with an established standard.

84.     This isn't discretionary: The pipeline is either scratched (objectively) or it isn't.

85.     Once the excavation on right of way was completed, a Line Locator confirmed the excavation met the required clearance and that the pipeline coating had not been damaged.

86.     He/she then left and filed a form report.

87.     Line Locators were not there when the contractor was backfilling the trench.

88.     LineQuest's client had employees to perform that duty.

89.     Most of a Line Locator's time spent in the field (not in the Midland office or driving) was spent locating and marking lines.

90.     Line Locators who sometimes performed excavation observation duties only spent about 5 to 10% of their time observing and reporting on excavations.

91.     In contrast, a Line Locator is required to locate and mark pipelines on every job.

92.     LineQuest sells line locating and marking, as well as observation and reporting, services to pipeline companies.

93.     Line Locators provide the very service LineQuest markets to its customers.

94.     Like every oilfield worker, Line Locators have stop work authority to stop any ongoing work which presented an immediate danger to the lives of those working nearby.

95.     Every single person working in the oilfield—from the lowest ranking laborer to the highest manager—has this very same authority.

96.     Line Locators do not have authority to green light, alter or halt contractor operations outside their stop work authority.

97.     Stop work authority is not discretionary.

98.     Line Locators are taught the established safety procedures and policies.

99.     Line Locators must act if an unsafe act violates these procedures.

100.     Line Locators could only use stop work authority if a clear, well established rule had been violated. Line Locators were not permitted to deviate from these rules.

101.     Prior to January 2019 all oil and gas Line Locators were paid hourly and paid overtime for hours worked over 40 in a workweek.

102.     In December 2018, LineQuest called each Line Locator into the corporate office and told them LineQuest was changing to a salary pay structure in January 2019.

103.     After January 2019, oil and gas Line Locators no longer received overtime pay.

104.     In addition to not receiving overtime, Line Locator salaries were docked if they did not work "mandatory" Saturdays.

105.    LineQuest supervisor, Aaron Thomas, would normally tell the Line Locators on Thursday if they were going to be required to work on Saturday (two days later).

106.    For example, Line Locator Emilio Ruiz, had his salary docked when he could not work a "mandatory" Saturday.

107.    Ruiz was told on Thursday that he must work Saturday, but Ruiz was unable to work.

108.    LineQuest supervisor, Aaron Thomas, told Ruiz that his salary would be docked if he did not work.

109.    Ruiz's salary was docked even though he had already worked Monday through Friday (and over 40 hours).

110.    As another example of improper docking, Pablo "Paul" Arispe's alleged "salary" was docked because he was late.

111.    LineQuest wrote Arispe up for being late to work on April 28, 2020.

112.    Even though he was merely *late*, he was docked the entire day. On top of that, he was suspended for an additional day.

113.    As yet another example of improper docking, Marco Gonzales' alleged "salary" was docked because he left work early on October 22, 2019.

114.    Even though he worked part of that day, LineQuest docked him an entire day's pay.

115.    He was also suspended—and docked—for 2 additional days on October 28 and 29.

116.    Plaintiff regularly worked more than 40 hours per week.

117.    LineQuest did not pay Plaintiff overtime when he worked more than 40 hours in a week.

118.    LineQuest should have paid Plaintiff overtime as required by the FLSA.

## Cause of Action – FLSA Overtime Violation

119.     By failing to pay Plaintiff overtime at one-and-one-half times his regular rates, LineQuest violated the FLSA's overtime provisions.

120.     LineQuest owes Plaintiff the difference between the rate actually paid and the proper overtime rate.

121.     Because LineQuest knew, or showed reckless disregard for whether, its pay practices violated the FLSA, LineQuest owes these wages for at least the past three years.

122.     LineQuest also owes Plaintiff an amount equal to the unpaid overtime wages as liquidated damages.

123.     Plaintiff is entitled to recover all reasonable attorneys' fees, costs, and expenses incurred in this action.

## Prayer

Wherefore, Plaintiff prays for relief as follows:

1.     Judgment awarding Plaintiff all unpaid overtime compensation, liquidated damages, attorneys' fees, costs, and expenses under the FLSA;

2.     Such other general and special relief as allowed by law;

3.     Pre- and post-judgment interest at the highest rate allowable by law; and

4.     All such other and further relief to which Plaintiff may show himself to be justly entitled.

Respectfully submitted,
**BRUCKNER BURCH PLLC**


*/s/ Rex Burch*
Richard J. (Rex) Burch
Texas Bar No. 24001807
11 Greenway Plaza, Suite 3025
Houston, Texas 77046
713-877-8788 – Telephone

713-877-8065 – Facsimile
rburch@brucknerburch.com

Michael A. Josephson
Texas Bar No. 24014780
Andrew W. Dunlap
Texas Bar No. 24078444
**Josephson Dunlap**
11 Greenway Plaza, Suite 3050
Houston, TX 77046
(713) 352-1100 [Telephone]
(713) 352-3300 [Fax]

**Attorneys in Charge for Plaintiffs**